# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM ROBINSON | : | CIVIL ACTION |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | No. 18-341 |
| | : | |
| NATIONAL RAILROAD PASSENGER | : | |
| CORPORATION d/b/a AMTRAK and | : | |
| BROTHERHOOD OF MAINTENANCE | : | |
| OF WAY EMPLOYEES | : | |
| *Defendants.* | : | |

## MEMORANDUM

### I.  BACKGROUND

Defendant National Railroad Passenger Corporation d/b/a Amtrak ("Amtrak" or "Defendant Amtrak") is a transportation company that provides passenger rail service throughout the United States. ECF No. 52-3 at ¶ 1.[1] Plaintiff, William Robinson ("Robinson" or "Plaintiff"), began working for Amtrak in March 2013 as a trackman in the Engineering Department. *Id.* at ¶ 2. William Robinson is African-American. *Id.* at ¶ 3. In or about December 2015, William Robinson became an EA Welding Foreman. *Id.* at ¶ 4. Defendant Brotherhood of Maintenance of Way Employees ("BMWE," "Defendant BMWE," or "Union") is a labor union that represents employees working in the railway industry. *Id.* at ¶

---

[1]The following facts are stipulated and undisputed by all parties unless otherwise noted.  See ECF No. 52-3.

5. Amtrak and BMWE are parties to a collective bargaining agreement ("Amtrak-BMWE Agreement" or "Collective Bargaining Agreement"). *Id.* at ¶ 6. During the time pertinent to this matter, Jed Dodd ("Dodd") was the Chairman of the Pennsylvania Federation of BMWE. *Id.* at ¶ 7.

William Robinson was a member of BMWE during his employment with Amtrak and was covered by the Amtrak-BMWE Agreement. *Id.* at ¶ 8. Besides being a member, William Robinson did not hold a position/office within BMWE. *Id.* at ¶ 9. John Yager ("Yager") was employed by Amtrak as a foreman during the time pertinent to this matter. *Id.* at ¶ 10. Yager is Caucasian. *Id.* at ¶ 11. Yager is older than Robinson. *Id.* at ¶ 12. During the time pertinent to this matter, Yager was the secretary-treasurer of his BMWE Local Union. *Id.* at ¶ 13.

### 1. Railway Terminology

A Supplemental Shunting Device ("SSD") is a railway safety device that prevents a dispatcher from routing a train to a particular track by sending a signal to the dispatcher showing that the track is not clear. Id. at ¶ 14. Foul time is a form of railway safety protection used to prevent trains from entering into an area of track where track personnel and/or equipment are operating. Id. at ¶ 15. The foreman of a worksite obtains foul time by contacting Amtrak's dispatchers when equipment or employees will be on or near a track. Id. at ¶ 16. When foul time

is obtained, Amtrak's dispatchers will not send a train down the fouled track. *Id.* at ¶ 17. When foul time on a track is released by the foreman, Amtrak's dispatchers understand that the track is clear and they can send trains down the track. *Id.* at ¶ 18. Only the foreman who obtains foul time on a track can release that foul time. *Id.* at ¶ 19. A whistle board is railway safety device. *Id.* at ¶ 20. It is a sign marking where a locomotive engineer is required to sound the horn or whistle to alert workers in the area of the approaching train. *Id.* A "Form D" is the form a foreman fills out at the beginning of his shift to assume responsibility for the tracks. *Id.* at ¶ 21. Amtrak provided Robinson with training necessary to become a foreman. *Id.* at ¶ 22.

The North American Operating Rules Advisory Committee ("NORAC") maintains a set of operating rules that govern the operation of its signatory railroads. *Id.* at ¶ 23. Prior to April 3, 2016, Robinson was trained on the NORAC rules and was NORAC-qualified. *Id.* at ¶ 24. To be "NORAC qualified" means that the qualified employee is required to abide by the rules and regulations of NORAC. *Id.* at ¶ 25. Robinson understood that he was required to follow the NORAC operating rules while working at Amtrak. *Id.* at ¶ 26. NORAC operating rules include:

    a.    <u>NORAC Operating Rule B</u>. Rule B states "Employees must be familiar with and obey all rules and special instructions that relate to

3

their duties. If in doubt as to the meaning or application of a rule or special instruction, an employee must request an explanation from the proper authority." *Id*. at ¶ 27.

    b.   <u>NORAC Operating Rule N</u>. Rule N states "Employees on duty on any division or railroad must comply with the orders and instructions of that division or railroad, unless otherwise directed." *Id*.

    c.   <u>NORAC Operating Rule 997</u>. Rule 997 states "Foreman and Track Car Drivers are responsible for the movement, safety, and care of track cars and employees in their charge. They must follow the rules, special instructions, and other authorizations that govern this responsibility." *Id*.

    d.   <u>Rule 140-S1</u>. Rule 140-S1 states in part, "Before allowing additional employees to join the work being performed under Foul Time permission, the employee who was granted Foul Time by the Dispatcher must conduct a job briefing with the additional employees, and must review the track(s) being protected, the Foul Time track and time limits, and all other factors affecting the work. . . The employee who was granted Foul Time by the Dispatcher or Operator must not release the Foul Time until they have ensured that all fouling activity under the authority has been cleared." *Id*.

e.    Rule 140-S2. Rule 140-S2 states, in part, that the rule "requires the employee in charge of "covered fouling activities" to apply an approved Supplemental Shunting Device (SSD) to the track(s) to be fouled, after receiving foul time from the Dispatcher or Operator. The purpose of the SSD is to supplement, not replace, blocking device protection provided by the Dispatcher or Operator." Rule 140-S2 applies "when equipment will be used to foul a track in signaled territory or within interlocking limits for more than 5 minutes." *Id.*

f.    Rule 716 –S2. Rule 716-S2 states that "[t]elephones must not be used in lieu of radio communication to obtain or release main track authorities or to copy mandatory directives. Where radio communication is not possible, a telephone may be used to obtain or release main track authorities or to copy mandatory directives. (a) Before using a telephone to obtain or release a main track authority or copy a mandatory directive, all crew members must participate in a job briefing and agree that it is safe to do so. (b) Immediately after obtaining main track authorities or copying a mandatory directive, all crew members must again participate in a job briefing to properly disseminate information from that communication. (c) Before reporting clear or releasing a main track authority, all crew members must participate in a job briefing to

5

ascertain and agree on the exact location that their entire train has passed, and that it has cleared the affected limits . . ." *Id.*

The Roadway Worker Protection ("RWP") is a set of federal regulations applicable to Amtrak and other railroads, which prescribe minimum safety rules and standards to protect roadway works (i.e. people who work on and around railroad tracks) from dangerous accidents involving rail cars, locomotives, and other rail equipment. *Id.* at ¶ 28. While at Amtrak, Robinson was trained on RWP rules and was RWP-qualified. *Id.* at ¶ 29. To be qualified in RWP mean that the qualified employees was required to follow the rules of RWP. *Id.* at ¶ 30. Robinson understood that he had to follow the rules of RWP while working at Amtrak. *Id.* at ¶ 31; ECF No. 52-5 at 34. As of 2015, the use of supplemental shunting devices were no longer required by the RWP. ECF No. 52-3 at ¶ 32.

The RWP rules include:

    a. <u>RWP Rule 315</u>. Rule 315 states, in relevant part, "when an Amtrak employee . . . is assigned a duty that calls for that employee to foul a track, an on-track safety job briefing must be provided prior to starting any work or fouling a track . . . A job briefing for on-track safety shall be deemed complete only after the roadway worker has acknowledged understanding of the on-track safety procedures and instructions presented." *Id.* at ¶ 33.

6

b. <u>RWP Rule 318</u>. Rule 318 states, in relevant part, that "prior to performing any task which requires fouling a track or has the potential to foul a track, all roadway workers involved must participate in an On Track Safety briefing. This On Track Safety Briefing must be conducted and documented at the work location and include the means by which on-track safety will be provided, and instructions for the on-track safety procedures to be followed. . . . The On Track Safety Briefing must be conducted by the roadway worker designated, qualified, and responsible for providing on-track safety." *Id.*

c. <u>RWP Rule 339</u>. Rule 339 states, in relevant part, that whistle boards are to be used by roadway work groups of five persons or more when the duration of work exceeds one hour. *Id.*

## 2. Amtrak Train 89 Accident

Robinson was a foreman who worked on a "55-hour outage" track maintenance project near Chester, Pennsylvania in April 2016. *Id.* at ¶ 34. John Yager was a foreman who worked on a "55-hour outage" track maintenance project near Chester, Pennsylvania in April 2016. *Id.* at ¶ 35. Robinson served as the foreman directing a track maintenance team from the evening of April 2, 2016 to the morning of April 3, 2016. *Id.* at ¶ 36. Robinson obtained and released foul

time at various times during his shift. *Id*. at ¶ 37. At times during his shift, Robinson used his cell phone instead of his radio to contact the dispatcher to obtain and release fouls. *Id*. at ¶ 38. Trains were able to, and did, pass through the work area only when Robinson released foul time. *Id*. at ¶ 39. Yager was scheduled to relieve Robinson as foreman the morning of April 3, 2016. *Id*. at ¶ 40.

John Yager relieved Robinson as foreman the morning of April 3, 2016. *Id*. at ¶ 41. Robinson called Amtrak dispatch on his cell phone at 7:27am to release his foul time on tracks 1, 3, and 4. *Id*. at ¶ 42. Robinson did not attempt to use his radio when calling the dispatcher to release his fouls. *Id*. at ¶ 43. Robinson told the dispatcher that "I was calling to knock down form D number A1403. Uh, Yager's taking over the track. I just want to, uh, release my form D." *Id*. at ¶ 44. Robinson told the dispatcher that he "wanted to release these files [sic] and, uh, Yager is going to pick them up, um, my files [sic] on number one, three and four track between Hook and Baldwin." *Id*. at ¶ 45. It is undisputed that Robinson was requesting to release his "fouls," not "files." *Id*. at ¶ 46. The dispatcher responded, "I show you clear your files [sic] number one, three, and four track, Hook to Baldwin, 7:29 in the a.m." *Id*. at ¶ 47. Robinson confirmed, stating "All right. 7:29 a.m. Foreman Robinson is all clear of his files, one, three, and four between Hook and Baldwin." *Id*. at ¶ 48.

A backhoe was on track 3 at the time Robinson released his fouls. *Id.* at ¶ 49. Robinson did not tell the dispatcher that the backhoe was still on track 3. *Id.* at ¶ 50. At the time Robinson released his fouls, he knew that two employees were still working on the track. *Id.* at ¶ 51. Robinson did not tell the two employees working on the track that he released his foul time. *Id.* at ¶ 52. Robinson, who was 150 feet from the two employees at the time he was leaving the work site, had no reason to believe that the two employees knew he released his fouls. *Id.* at ¶ 53. Robinson told Amtrak's dispatcher that Yager would call the dispatcher to obtain foul time for the tracks that Robinson released his fouls for. *Id.* at ¶ 54. Robinson left the work site after speaking with the dispatcher, a few minutes after 7:30 a.m. *Id.* at ¶ 55. Prior to leaving the worksite, Robinson did not know whether Yager had obtained foul time for the same tracks. *Id.* at ¶ 56. Yager did not contact dispatch to obtain foul time. *Id.* at ¶ 57. At approximately 7:50 a.m. a passenger train ("Train 89") proceeded down track 3 at approximately 100 miles per hour and struck the backhoe. *Id.* at ¶ 58. The backhoe operator, Joseph Carter, and a supervisor, Peter Adamovich, were killed as a result of the collision, and several other Amtrak employees and passengers were injured. *Id.* at ¶ 59; ECF No. 52-5 at 31:21. After the train accident ("Train 89 Accident"), Robinson requested and was afforded a medical leave of absence. *Id.* at ¶ 60. In addition, other Amtrak employees working at

9

the job site during the Train 89 Accident, including Yager, Richard Brigandi ("Brigandi") (the watchman at the scene) and Kyle Snyder ("Snyder") (a supervisor at the scene) went on medical leave following the accident. *Id.* at ¶ 61.

### 3. NTSB Investigations

On the morning of the accident, investigators from the National Transportation Safety Board ("NTSB") and the Federal Railroad Administration ("FRA") arrived at the scene and investigated the accident. *Id.* at ¶ 62. The NTSB is an independent federal agency dedicated to promotion aviation, railroad, highway, marine and pipeline safety. *Id.* at ¶ 63. The NTSB is mandated by Congress to investigate transportation accidents, determine the probable causes of the accidents, issue safety recommendations, study transportation safety issues, and evaluate the safety effectiveness of government agencies involved in transportation. *Id.* The NTSB interviewed witnesses, including Robinson and Yager, and listened to transcripts of various communications, including Yager's and Robinson's communications with Amtrak's dispatchers. *Id.* at ¶ 64. On September 13, 2016, the FRA issued to Robinson, Yager and Brigandi "Notices to Individual Regarding Violation(s) of Federal Railroad Safety or Hazardous Materials Transportation Statutes, Regulations or Orders", charging them each with a violation of federal safety regulations in connection with the Train 89 Accident. *Id.* at ¶ 65.

4. Disciplinary Charges against Robinson, Yager, Brigandi, and Snyder

    i. *Disciplinary Proceedings Pursuant to the Amtrak-BMWE Agreement*

Under the Amtrak-BMWE Agreement, Rule 68, Amtrak must provide employees with "a fair and impartial" disciplinary hearing before disciplining them. *Id.* at ¶ 66. Before disciplining an employee covered by the Amtrak-BMWE Agreement, the Amtrak-BMWE Agreement requires that Amtrak must bring a "charge" against the employee. *Id.* at ¶ 67. Charges are also known as a Notice of Investigation ("NOI"). *Id.* The Amtrak-BMWE Agreement requires that the charging officer presents evidence of an employee's alleged wrongdoing at an internal disciplinary "trial" presided over by a hearing officer. *Id.* at ¶ 68. The charging officer and hearing officers are both Amtrak employees. *Id.* at ¶ 69.

    ii. *Amtrak Issues NOIs to Four Employees in Connection with the Train 89 Accident*

Amtrak issued an NOI dated April 25, 2016 to Robinson in connection with the accident, listing the following alleged failures:

- Failing "to utilize and place proper portable Whistle Boards, as required by Roadway Worker Protection (RWP) Rules,"

- Failing to perform a follow-up On Track Safety Job Briefing after a track was fouled with a backhoe,

- Failing "to utilize Supplement Shunting Devices on track 3, which was being fouled by [] the Backhoe Equipment,"

- Failing "to ensure that all fouling activity under his authority had been cleared before releasing his Foul Time," and

- Failing "to utilize proper radio communication when he used a personal cell phone [to call the dispatcher] to release his fouls." *Id.* at ¶ 70.

According to the NOI, the failures Robinson was charged with violated the following rules or procedures:

- Violation of Amtrak's Standards of Excellence pertaining to safety, attending to duties, and teamwork;

- Violation of NORAC Operating Rules B, N, 997, 140-S1, 140-S2, and 716 S2. Violation of Roadway Worker Protection Procedures –Rule 315, 318, and 339

- Violation of Amtrak's Cardinal Rules for failing to comply with applicable Roadway Worker Protection Procedures. *Id.* at ¶ 71.

Carmina Agrawal ("Agrawal") was the Amtrak charging officer who signed Robinson's NOI. *Id.* at ¶ 72.

Amtrak issued an NOI dated April 25, 2016 to Yager in connection with the accident listing the following alleged failures:

- Failing to conduct a proper job briefing;

- Failing to utilize and place Whistle Boards;

- Failing to use SSDs on a fouled track; and

- Failing to utilize proper radio communications by using his personal cell phone to call the dispatcher. *Id.* at ¶ 73.

According to the NOI, the failures Yager was charged with violated the following rules or procedures:

- Violation of Amtrak's Standards of Excellence pertaining to safety, attending to duties, and teamwork;

- Violation of NORAC Operating Rules B, N, 997, 140-S2, and 716 –S2;

- Violation of Roadway Worker Protection Procedures –Rule 318 and 339; and

- Violation of Amtrak's Cardinal Rules for failing to comply with applicable Roadway Worker Protection Procedures. *Id.* at ¶ 74.

Amtrak issued an NOI dated April 25, 2016 to Snyder (Caucasian) in connection with the accident, alleging that he "failed to ensure that proper

protection was provided by his foreman in charge, William A. Robinson." *Id.* at ¶ 75. The NOI further stated that the failures Snyder was charged with violated Amtrak's Standard of Excellence relating to safety, attending to duties, and teamwork. *Id.*

Amtrak issued an NOI dated May 26, 2016 to Brigandi (Caucasian) in connection with the accident, alleging that he "failed to raise his disc and give timely warning to roadway workers of an approaching train." *Id.* at ¶ 76. The NOI further stated that the failures Brigandi was charged with committing violated the following rules or procedures:

- Amtrak's Standard of Excellence relating to safety, attending to duties, and teamwork;

- Violation of Roadway Worker Protection Procedures, Rule 329; and

- Violation of Amtrak's Cardinal Rules for failing to comply with applicable Roadway Worker Protection Procedures. *Id.*

Snyder voluntarily resigned on November 1, 2016, without returning from medical leave. *Id.* at ¶ 77. Brigandi voluntarily separated from Amtrak without returning from medical leave. *Id.* at ¶ 78.

### iii. *Robinson Returns to Work and a Disciplinary Hearing is Scheduled*

On April 13, 2017, William Robinson voluntarily returned from medical leave and was immediately "held out of service," or, in other words, suspended with pay pending a disciplinary hearing on the NOI previously issued by Amtrak. *Id.* at ¶ 79. Amtrak scheduled William Robinson's disciplinary hearing for April 26, 2017. *Id.* at ¶ 80. Frances Krische ("Krische") of Amtrak's Office of Disciplinary Investigations was assigned as the hearing officer. *Id.* at ¶ 81. Gene Anirina ("Anirina") was the Union-representative assigned to represent William Robinson during his disciplinary hearing pursuant to the Amtrak-BMWE Agreement. *Id.* at ¶ 82. Anirina is a Vice Chairman of the Pennsylvania Federation of BMWE. *Id.* at ¶ 83. He is Caucasian and is not an attorney. *Id.*

### iv. *Pre-Disciplinary Hearing Events*

William Robinson retained Mark Schwartz as his attorney before his disciplinary hearing. *Id.* at ¶ 84. During their first conversation, Anirina advised William Robinson to resign instead of facing dismissal after his disciplinary hearing, and to attempt to get a job at New Jersey Transit or SEPTA. *Id.* at ¶ 85. Robinson rejected Anirina's advice to resign. *Id.* Anirina never interviewed Yager about the train crash. *Id.* at ¶ 86. Anirina never interviewed the watchman

on duty. *Id.* at ¶ 87. Anirina never looked at Robinson's personnel file. *Id.* at ¶ 88. Anirina didn't know if Yager had a job briefing with the workers on site but did not consider that fact to be relevant to Robinson's defense. *Id.* at ¶ 89.

In an April 13, 2017 email to Jed Dodd, Robinson complained that he was not receiving adequate representation from Anirina. *Id.* at ¶ 90. On April 20, 2017, Robinson emailed Anirina a list of documents that he wanted to be presented and a list of witnesses who he wanted to testify at the disciplinary hearing. *Id.* at ¶ 91.

On April 20, 2017, Robinson filed a complaint with the EEOC, *id.* at ¶ 92, which alleged:

> "I have been discriminated against as a result of being black and enduring an illegal working environment that historically has included the display of hanging 'nooses' and other racist attributes. I am now being tried internally as being responsible for a train accident of April 3, 2015[2] when the real responsibility was with John Yaegar [sic] who replaced me as I went of my shift. This matter has been investigated by the NTSB and I was exonerated. Notwithstanding, AMTRAK is holding proceedings against me that threatened my job termination. What is more is that I have to be defended by a union which clearly does not want to advocate for me. This all constitutes a racist, retaliatory and illegal environment." *Id.* at ¶ 93.

---

[2] The Train 89 Accident dent at issue occurred on April 3, 2016, *see supra* at 8, but the EEOC form incorrectly states April 3, 2015.

On April 21, 2017, Anirina forwarded via email Robinson's list of requested documents and witnesses to Agrawal. *Id.* at ¶ 94. In an April 21, 2017 email to Frank Kruse regarding the documents and witnesses requested by Anirina, Agrawal wrote "Is he out of his mind? NO, NO, NO and NO. I have given him what I need to prove my case and that will be it." *Id.* at ¶ 95. On April 24, 2017, a telephonic pre-hearing conference took place between Anirina, Agrawal, and Krische. *Id.* at ¶ 96. Krische, as hearing officer, decided Amtrak would:

- Allow Larry Smoot ("Smoot") and Maurice Robinson ("M. Robinson") to testify at William Robinson's disciplinary hearing, but none of the other witnesses William Robinson had requested,

- Not supply Amtrak's invoice for SSDs that were ordered after the train collision,

- Not supply SSD confirmation for the entire 55 hour outage,

- Provide only the job briefings and on track briefings (*i.e.*, briefings that foreman provided to workers regarding work and safety issues) for the entire 55 hour outage,

- Not provide Form Ds and foul time logs. *Id.*

17

During the pre-hearing telephonic conference, Anirina objected to Krische's decision to not supply all requested documents and witnesses. *Id.* at ¶ 97. In an April 25, 2017 email to Anirina, William Robinson wrote, "Amtrak is a cesspool and with this inadequate representation the BMWE has no problems wading in it as long as they protect THEIR PEOPLE." *Id.* at ¶ 98.

Rule 71 of the BMWE-Amtrak Agreement and the January 17, 2008 Consent Decree entered into between the BMWE and Amtrak govern the identification and calling of witnesses. *Id.* at ¶ 99. Robinson requested that his attorney, Mark Schwartz, be allowed to be present at his disciplinary hearing. *Id.* at ¶ 100. Anirina relayed the request to Krische, who decided Schwartz would not be permitted to attend William Robinson's disciplinary hearing. *Id.* The Amtrak-BMWE Agreement states that an employee may have his "duly accredited representative" represent him at a disciplinary hearing. *Id.* at ¶ 101. The Amtrak-BMWE Agreement defines "duly accredited representative" as "the representative or System Officer of the organization signatory hereto." *Id.* at ¶ 102. At the time of the Train 89 collision, Maurice Robinson was an Amtrak supervisor and Smoot was a foreman. *Id.* at ¶ 103. The only witness at the hearing was Kruse. *Id.* at ¶ 104.

Kruse admitted that he was not present at the time of the crash and had no firsthand knowledge of what happened at the crash on April 3, 2016. *Id.* at

18

¶ 105. Kruse first learned of the crash from John Yager. *Id.* at ¶ 106. John Yager called Kruse on the phone within five minutes of the crash occurring. *Id.* at ¶ 107. After Kruse arrived at the scene of the crash, he spoke with John Yager. *Id.* at ¶ 108. After speaking with John Yager, Kruse did not speak to William Robinson or seek him out. *Id.* at ¶ 108.

Kruse did not make any attempts to communicate with William Robinson until approximately one year after the crash. *Id.* at ¶ 109. Kruse is an Amtrak manager and, at the time of Robinson's disciplinary hearing, he was an Assistant Division Engineer. *Id.* at ¶ 110. As the Assistant Division Engineer, Kruse was responsible for track maintenance, construction and inspection of the tracks in the Philadelphia and Wilmington areas, which includes the track where the Train 89 Accident occurred. *Id.* at ¶ 111. Because the Train 89 Accident occurred in Kruse's territory, he was required to, and did, respond to the scene of accident immediately after it occurred. *Id.* at ¶112.

Mr. Kruse stayed on scene for approximately twelve hours, speaking with multiple employees involved in the accident and other engineering managers and collecting documentation from the employees involved. *Id.* at ¶ 113. Robinson's internal hearing was held on April 26, 2017. *Id.* at ¶ 114. Hearing officer Krische, Charging Officer Agrawal, Mr. Kruse, Mr. Robinson, and Mr. Anirina were the only people in attendance. *Id.* at ¶ 115.

19

The hearing lasted approximately five hours and included direct and cross-examination testimony from Mr. Kruse on the charges that were brought against Mr. Robinson in his NOI. *Id.* at ¶ 116. Mr. Kruse was the only witness presented against Mr. Robinson. *Id.* at ¶ 117. Robinson made a closing statement during the hearing and did not mention that he believed he was being discriminated against on the basis of race. *Id.* at ¶ 118.

### v. *Post-Disciplinary Hearing Events*

On May 2, 2017, Krische issued a written decision which stated in its conclusion, "Thus, based on the testimony and hearing record as a whole, I find there was substantial evidence you did not conduct On Track Briefing and Job Briefing when the back hoe came on the jobsite; you did not set up supplemental shunting devices and whistle boards at the job site; you did not clear the tracks prior to calling in your foul time; and you used a personal cell phone to communicate as opposed to a radio all of which is in violation of the above referenced Amtrak Rules. Moreover, since the above rules include RWP violations I find you also violated the above cited Cardinal rules. As a result, I find that all of the charges are proven." *Id.* at ¶ 119.

Robinson was terminated on May 8, 2017 and notified the same day via FedEx Express Mail. *Id.* at ¶ 120. He received notice of his termination the next day. *Id.* On a May 8, 2017, Mark Schwartz sent Jed Dodd an email with the

subject line reading "Union Failure of Representation Notice" and attached to the email were Robinson's notice of termination letter and Hearing Officer Krische's decision. *Id.* at ¶ 121. In a May 9, 2017 email to Mark Schwartz, Jed Dodd wrote "Brother Robinson has been found guilty following an investigation and hearing held pursuant to the terms of the collective bargaining agreement and that BMWED is following contractual and statutory provisions governing an appeal from that discipline. The hearing officer's decision and notice of dismissal is attached for your ready reference." *Id.* at ¶ 122.

BMWE appealed Amtrak's decision to terminate William Robinson to Sharon Jindal ("Jindal"), Amtrak's Labor Relations Director, on May 10, 2017. *Id.* at ¶ 123. An appeal hearing took place on June 15, 2017. *Id.* at ¶ 124. Jindal denied the appeal of Krishe's decision on July 19, 2017. *Id.* at ¶ 125. William Robinson received notice of the denial of the appeal the next day. *Id.*

On August 4, 2017, Jed Dodd sent a letter to Mark Schappaugh, who works for the BMWE's Arbitration Department. *Id.* at ¶ 126. The letter has a subject line reading "RE: W. Robinson" and it states "Enclosed please find a copy of the above listed case. In my opinion, the nature of this case indicates that it would be best handled by the National Railroad Adjustment Board-Third Division. Therefore, I am submitting it to you for your review and progression to the Board, if you find that this case has merit." "W. Robinson" was copied

on the letter. *Id.* BMWE then appealed Amtrak's decision to terminate William Robinson to the National Railroad Adjustment Board ("NRAB") for an arbitration hearing. *Id.* at ¶ 127.

On August 24, 2017, BMWE sent the NRAB a letter advising it that the BMWE intended to file a submission disputing Amtrak's decision to dismiss William Robinson. *Id.* at ¶ 128. On November 9, 2017, BMWE made its pre-hearing submission to the NRAB. *Id.* at ¶ 129. Amtrak also made a pre-hearing submission to the NRAB. *Id.* at ¶ 130. The NRAB arbitration hearing was held on January 8, 2019. *Id.* at ¶ 131. The NRAB's decision was pending as of the date of the Stipulation of Undisputed Material Facts, March 13, 2019. *Id.* at ¶ 132.

On November 14, 2017, the NTSB issued its report regarding the Train 89 Accident. *Id.* at ¶ 133. Yager returned to work from medical leave in late August 2018 and was immediately held out of service pending a disciplinary hearing on the NOI previously issued by Amtrak. *Id.* at ¶ 134. Kruse had discussions with Brigandi and Schneider regarding their return to work. *Id.* at ¶ 135. Kruse did not have any such discussion with Will Robinson at any time. *Id.* at ¶ 136. Amtrak scheduled Yager's disciplinary hearing for September 24, 2018. *Id.* at ¶ 137. Prior to his scheduled disciplinary hearing, Yager notified Amtrak he was retiring. *Id.* at ¶ 138. Amtrak could not prevent Yager from retiring. *Id.* at ¶ 139. The Railroad Retirement Board is a federal agency that administers retirement

benefits for railroad workers nationwide and is a separate entity from Amtrak. *Id.* at ¶ 140. Yager retired from his position at Amtrak as of September 22, 2018. *Id.* at ¶ 141. Because Yager retired before his scheduled disciplinary hearing, the hearing was never held. *Id.* at ¶ 142. William Robinson did not have enough years of service with Amtrak to retire when he returned to work after the accident. *Id.* at ¶ 413.

### vi. *William Robinson's Allegations of Racial Discrimination*

William Robinson testified that he believes Amtrak discriminated against him based on race because he was "scapegoated" while Yager was "allowed to retire" instead of being subjected to a disciplinary hearing and disciplined, and because Kruse, Agarwal, and Krische did not allow all his witnesses and evidence at his disciplinary hearing. *Id.* at ¶ 144. William Robinson has never heard Kruse make any comments about blacks or African-Americans. *Id.* at ¶ 145. William Robinson testified that when he attended a welding class at Amtrak in 2014, someone in the class made a noose and hung it up in a tool shed. *Id.* at ¶ 146. William Robinson reported the incident to a supervisor and Amtrak investigated. *Id.* Amtrak removed the employee who was responsible for hanging the noose from class and disciplined the employee for his behavior. *Id.* at ¶ 147. William Robinson filed a charge of discrimination with the Equal

Employment Opportunity Commission as a result of the noose incident. *Id*. at ¶ 148. The EEOC issued a Right to Sue letter to Mr. Robinson. *Id*. at ¶ 149.

At that time, William Robinson understood he could file a lawsuit relating to the noose incident but chose not to do so. Id. at ¶ 150. William Robinson also testified that, in 2013, when he was first hired, a supervisor would not qualify him to be a watchman unless he moved from the night shift to the day shift. Id. at ¶ 151. William Robinson testified that he complained the supervisor was discriminating against him; in response, he was advised to go to the day shift to get qualified. Id. at ¶ 152. William Robinson went to the day shift, got his qualification, then returned to the night shift, then chose to go to Delaware to obtain other qualifications. Id. at ¶ 153. The noose incident and qualifications issue were the only times William Robinson ever complained to Amtrak about discrimination. Id. at ¶ 154.

## II.    STANDARD

Summary judgment "is appropriate where the moving party has established 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Burton v. Teleflex, Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it might affect the outcome of the suit under the governing law." *Id*. When reviewing a motion for summary judgment, the court views "the facts in the light most favorable to the

24

non-moving party and draws all reasonable inferences in that party's favor." *Id.* Although, "the non-moving party must present more than a mere scintilla of evidence," and must present evidence on which a jury could reasonably find for that party. *Id.* (internal quotation and citation omitted). Additionally, "[s]ummary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (internal quotation and citations omitted).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); Fed. R. Civ. P. 56(c). As the Supreme Court has emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote omitted)).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

25

requirement is that there be no *genuine* issue of material fact." *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986)) (emphasis added).

"When opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for

summary judgment." *Id*; *see Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903,

909 (3d Cir. 1984) (instructing that "conflicts of credibility should not be resolved

on a hearing on the motion for summary judgment unless the opponent's evidence

is too incredible to be believed by reasonable minds.").

## III.  DISCUSSION

  1. Amtrak's Motion for Summary Judgment

Defendant Amtrak moves for summary judgment on all of Plaintiff's claims

against it.

  i.  *Racial Discrimination in Violation of 42 U.S.C. § 1981 (Count I),*

  *Title VII (Count II) and the PHRA (Count III)*

Claims for race discrimination under 42 U.S.C. § 1981, Title VII and the

Pennsylvania Human Relations Act ("PHRA") are all subject to the *McDonnell*

*Douglas* burden shifting analysis. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410

(3d Cir. 1999); *see also Vaughan v. Boeing Co.*, 733 F. App'x 617, 622 (3d Cir.

2018) ("All claims of race discrimination brought under Title VII, § 1981, or the PHRA are governed by the 'familiar burden-shifting framework' set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)").

In order to establish a prima facie claim of discrimination, "[a] plaintiff must show that: 1) [he] is a member of a protected class, 2) [he] was qualified for the position [he] sought to attain or retain, 3) [he] suffered an adverse employment action, and 4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Vaughan*, 733 F. App'x at 622 (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 164 (3d Cir. 2013)).

If the plaintiff successfully establishes a prima facie case of discrimination, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. *Jones*, 198 F.3d at 410 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "Although the defendant need not prove that the articulated reason actually motivated the discharge, the reason must be clear and reasonably specific, to afford the plaintiff-employee a fair opportunity to pierce the proffered reason with facts of record." *Boykins v. Lucent Techs.*, Inc., 78 F. Supp. 2d 402, 409–10 (E.D. Pa. 2000), aff'd, 29 F. App'x 100 (3d Cir. 2002) (internal citations omitted).

If the defendant carries this burden, "the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Jones*, 198 F.3d at 410.

### a. Plaintiff's Prima Facie Case of Discrimination

Defendant Amtrak contends that Plaintiff cannot establish that he was qualified for the job nor that he was discharged under circumstances that could give rise to an inference of intentional discrimination. First, Defendant Amtrak asserts that because "two expert investigators from the FRA have opined that he should be permanently disqualified from ever working in any safety-sensitive position in the railway industry ever again," Plaintiff is "not qualified to be a railway foreman anywhere in the nation, including at Amtrak." ECF No. 52-1 at 27. Second, Defendant Amtrak maintains that Plaintiff has failed to put forth any evidence to show that three other employees connected to the accident were treated more favorably than Plaintiff, since one employee retired and the other two chose to end their employment at Amtrak without returning from medical leave. *Id.* at 28.

Plaintiff claims, "it is an absurdity for Amtrak to challenge [Plaintiff's] qualifications because it was Amtrak who trained him, qualified him as a foreman, and assigned him to serve as foreman at the worksite." ECF No. 57 at 23. Plaintiff

assumes that his training alone qualifies him to continue working as a foreman in a safety-sensitive position, whereas Defendant contends that the Train 89 Accident shows that Plaintiff, despite having training, was not qualified for such a position. However, Defendant assumes that the suggestion of two unidentified FRA experts that Plaintiff should not hold a safety-sensitive position indicates that Plaintiff is not qualified for the foreman position.

"While objective job qualifications should be considered in evaluating the plaintiff's *prima facie* case, the question of whether an employee possesses a subjective quality . . . is better left to consideration of whether the employer's nondiscriminatory reason . . . is pretext." *Dorsey v. Pittsburgh Assocs.*, 90 F. App'x 636, 639 (3d Cir. 2004) (quoting *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir.1995) (internal citations omitted)). "[T]o deny the plaintiff an opportunity to move beyond the initial stage of establishing a prima facie case because he has failed to introduce evidence showing he possesses certain subjective qualities would improperly prevent the court from examining the criteria to determine whether their use was mere pretext." *Id.* Therefore, this Court need not consider at this time whether Plaintiff introduced sufficient evidence to show he was qualified for the position of foreman.

Second, Plaintiff claims that he has shown the circumstances surrounding his termination give rise to an inference of discrimination because the charges brought

against Plaintiff "were based upon policies, standards and directives which were routinely ignored and/or incapable of being observed by track maintenance gangs," yet were brought against Plaintiff improperly by Kruse who used "them as a pretext . . . motivated by the color of Plaintiff's skin." ECF No. 57 at 24. Plaintiff contends that a collaboration between prosecutor Agrawal and Kruse resulted in Plaintiff's termination and that Kruse was "speaking to and consoling Yager at the scene while refusing to speak to Will Robinson, determining the charges against Will Robinson, being the only witness presented by Amtrak against Will Robinson, and obstructing Will Robinson's witnesses and evidence." *Id.*

The three employees who were also connected to the Train 89 Accident, and with whom Plaintiff compares himself, retired or quit and thus avoided being disciplined by Amtrak. Plaintiff, however, refused to quit, did not have enough years to retire, and therefore decided to go through with his disciplinary hearing, which resulted in termination. Plaintiff has presented no facts showing that those other employees were similarly situated and yet treated differently, nor has he shown that his termination occurred under circumstances that could give rise to an inference of discrimination. However, "the prima facie case under the *McDonnell Douglas–Burdine* pretext framework is not intended to be onerous," and it must "merely 'raise[] an inference of discrimination only because [the Court] presume[s] these acts, if otherwise unexplained, are more likely than not based on

the consideration of impermissible factors." *Sempier v. Johnson & Higgins*, 45

F.3d 724, 728 (3d Cir. 1995). Therefore, this Court assumes that Plaintiff has

stated a prima facie case of discrimination and moves on to consider whether

Defendant Amtrak articulated a legitimate, nondiscriminatory reason for Plaintiff's

termination.

### b. Amtrak Must Articulate A Legitimate, Nondiscriminatory Reason for Termination

If Plaintiff establishes a prima facie case of discrimination, the burden shifts

to Defendant Amtrak to produce evidence that the adverse action was taken for a

legitimate, non-discriminatory reason. *Jones*, 198 F.3d at 410. "The defendant

satisfies its burden at this step by introducing evidence which, taken as true, would

permit the conclusion that there was a nondiscriminatory reason for the

unfavorable [action].'" *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d

Cir. 2010) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)). "The

defendant need not even prove that the tendered reason was the actual reason for

its behavior." *Id.*

Defendant Amtrak contends that it terminated Plaintiff after concluding that

Plaintiff's violation of safety protocols contributed to a train collision, which was a

legitimate and non-discriminatory reason to terminate him. ECF No. 52-1 at 29.

Plaintiff states that Defendant Amtrak did not meet its burden to articulate a

legitimate, nondiscriminatory reason for terminating Plaintiff, because the disciplinary hearing Defendant Amtrak conducted was not "fair and impartial," as it was manipulated by Kruse, "a man with demonstrated racial animus exhibited directly with respect to Plaintiff specifically and African-Americans in general." ECF No. 57 at 25. Plaintiff does not show how Defendant Amtrak's reason for terminating Plaintiff was either illegitimate or discriminatory, and instead focuses only on his claim that the hearing was manipulated by Kruse.

The Court finds that Defendant Amtrak has articulated a legitimate and nondiscriminatory reason for terminating Plaintiff. Therefore, the burden shifts to Plaintiff to show that Amtrak's proffered reason is pretext for discrimination.

### c. Plaintiff Must Show Amtrak's Legitimate, Nondiscriminatory Reason Is Pretext

As Defendant Amtrak has carried the burden of articulating a legitimate, nondiscriminatory reason for terminating Plaintiff, Plaintiff must prove, by a preponderance of the evidence, that the legitimate, nondiscriminatory reasons were "not its true reasons, but were a pretext for discrimination." *Jones*, 198 F.3d at 410. Plaintiff must do so by "submit[ing] evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or

determinative cause of the adverse employment action." *Whitmire v. Kvaerner Philadelphia Shipyard*, 340 F. App'x 94, 97–98 (3d Cir. 2009). "The plaintiff 'cannot simply show that the employer's decision was wrong or mistaken' but rather 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons.'" *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 199 (3d Cir. 2015) (quoting *Ross v. Gilhuly*, 755 F.3d 185, 194 n. 13 (3d Cir. 2014)) (internal citations omitted).

Defendant Amtrak contends that Plaintiff cannot meet his burden to demonstrate pretext because (1) Plaintiff's allegation that he was scapegoated for the Train 89 Accident does not demonstrate pretext, (2) Plaintiff's allegation that he was treated less favorably than other employees is contradicted by undisputed evidence, (3) Plaintiff has no evidence that any decision maker acted with a discriminatory motive,  and (4) Plaintiff's allegations that his internal disciplinary hearing was unfair do not demonstrate pretext and are otherwise preempted by the Railway Labor Act ("RLA"). ECF No. 52-1 at 30-43.

Defendant Amtrak contends that Plaintiff "will try to demonstrate pretext by arguing that other employees were also at fault for the accident or were more at fault, and/or that Amtrak's policies or practices also contributed to the accident, and/or that Amtrak failed to prove some of the disciplinary charges against him." ECF No. 52-1 at 31. Defendant claims that "no reasonable jury could possibly conclude that he was so obviously and entirely without fault that Amtrak's decision to bring disciplinary charges against him and terminate his employment could only have been a ruse to cover up a desire to terminate him because of his race." *Id.*

Plaintiff responds that Amtrak "goes to great lengths to create the false impression that William Robinson was responsible for the tracks at the time of the crash although John Yager was the one who was indisputably in control," and it was John Yager who "did not have the requisite paperwork evidencing the necessary meeting of those working on the tracks." ECF No. 57 at 26. Plaintiff baldly states, "[t]he record is replete with facts demonstrating discriminatory animus against Mr. Robinson sufficient to enable a jury to conclude that William Robinson's race was a motivating factor in his mistreatment and termination of employment." *Id.* at 27. Plaintiff claims, "[i]t is about the manner in which [Plaintiff] was disciplined and the racial animus exhibited primarily after that train

collision and the racial animus attendant to what was purported to be a 'fair and impartial' hearing." *Id.* at 26.

The Stipulated Undisputed Material Facts ("SUMF") (ECF No. 52-3) show that Plaintiff released his fouls on tracks 1, 3, and 4, despite there being a backhoe on track 3 at the time he released his fouls, that Robinson did not tell the dispatcher that the backhoe was still on track 3, that Robinson used his cell phone and did not attempt to use his radio when calling the dispatcher to release his fouls, that Robinson knew there were two employees still working on the track when he released his fouls, that he had not told the two employees working on the track that he released his foul time nor had any reason to believe the two employees knew he released his fouls, and that the two employees working on that track were killed as a result of a passenger train proceeding down the track and striking the backhoe. ECF No. 52-3 at ¶ 42-56, 58-59. The SUMF further show that Robinson did not know whether Yager had obtained foul time for the same tracks prior to Robinson leaving the worksite. *Id.* at ¶ 56. The SUMF show that Plaintiff was found guilty by Amtrak of violating the following rules or procedures:

> Violation of Amtrak's Standards of Excellence pertaining to safety, attending to duties, and teamwork; [] Violation of NORAC Operating Rules B, N, 997, 140-S1, 140-S2, and 716 S2[;] Violation of Roadway Worker Protection Procedures –Rule 315, 318, and 339[;]. Violation of Amtrak's Cardinal Rules for failing to comply with applicable Roadway Worker Protection Procedures.
> ECF No. 52-3 at ¶ 71, 119.

The SUMF show that Amtrak Rule 140-S1 requires that "[t]he employee who was granted Foul Time by the Dispatcher or Operator **must not release the Foul Time until they have ensured that all fouling activity under the authority has been cleared**." *Id.* at ¶ 27 (emphasis added). Amtrak Rule 716-S2 states that "[t]elephones must not be used in lieu of radio communication to obtain or release main track authorities or to copy mandatory directives. Where radio communication is not possible, a telephone may be used to obtain or release main track authorities or to copy mandatory directives. (a) Before using a telephone to obtain or release a main track authority or copy a mandatory directive, all crew members must participate in a job briefing and agree that it is safe to do so." *Id.*

The SUMF additionally show that, following Amtrak's disciplinary hearing, the hearing officer, Krische, issued a written decision, finding "there was substantial evidence [Robinson] did not conduct On Track Briefing and Job Briefing when the back hoe came on the jobsite; [Robinson] did not set up supplemental shunting devices and whistle boards at the job site; [Robinson] did not clear the tracks prior to calling in [his] foul time; and [Robinson] used a personal cell phone to communicate as opposed to a radio all of which is in violation of the above referenced Amtrak Rules." *Id.* at ¶ 119.

The issue the Court must determine is "whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Jones v. Temple Univ.*, 622 F. App'x 131, 135–36 (3d Cir. 2015). Plaintiff has presented no evidence to discredit Defendant Amtrak's legitimate, nondiscriminatory reasons for his termination and no evidence from which a fact finder could infer that Amtrak's actions were motivated by discriminatory animus. Despite claiming "[t]he record is replete with facts demonstrating discriminatory animus against Mr. Robinson sufficient to enable a jury to conclude that William Robinson's race was a motivating factor in his mistreatment and termination of employment," Plaintiff has not presented any evidence to show that discriminatory animus motivated Amtrak in terminating Plaintiff. To the contrary, the SUMF show that Plaintiff did in fact violate Amtrak rules and procedures; whether Plaintiff or Yager was *more* at fault is irrelevant.

### (ii)    *Plaintiff's Allegation That He Was Treated Less Favorably Than Other Employees.*

Defendant next contends that Plaintiff "may attempt to save his case by arguing that invidious discrimination was more likely than not the reason for Amtrak's actions." ECF No. 52-1 at 33. Defendant claims that Plaintiff "cannot demonstrate pretext by comparing himself to Mr. Yager or to any other employee outside the protected class," because Plaintiff and "Yager (as well as Mr. Snyder

and Mr. Brigandi) were all treated identically in that Amtrak issued disciplinary charges to each of them following the Train 89 accident, and it did not pursue a hearing against any of them while they were on medical leave." ECF No. 52-1 at 34. Therefore, Defendant Amtrak claims that the "[d]ifferences in how each employee ultimately separated from Amtrak came into play only when these employees ceased being similarly-situated to Mr. Robinson," since Yager retired immediately after coming back from medical leave and Snyder and Brigandi chose to separate from employment with Amtrak without ever returning from medical leave. *Id.*

Plaintiff baldly states that "[e]vidence of the preferential treatment afforded to Yager by Amtrak relative to William Robinson is well-documented in the evidentiary record," and the previous claims of "discrimination and discriminatory environment can be used to detail and depict the environment and to demonstrate Defendant's motive, plan and intent" in terminating Plaintiff. ECF No. 57 at 27.

For Plaintiff to defeat summary judgment under this theory, he "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

Defendant Amtrak's treatment of three other employees connected to the Train 89 Accident is insufficient evidence for a factfinder to reasonably believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action because all three other employees chose to retire, resign or separate prior to a disciplinary hearing. ECF No. 52-3 at ¶¶ 77, 78, 138.

All employees at issue, Plaintiff, Yager, Snyder, and Brigandi, all went on medical leave following the Train 89 Accident. *Id.* at ¶¶ 60; 61. Defendant Amtrak issued NOIs as to all four of these employees. *Id.* at ¶ 70, 73, 75, 76. Snyder voluntarily resigned on November 1, 2016, without returning from medical leave. *Id.* at ¶ 77. Brigandi voluntarily separated from Amtrak without returning from medical leave. *Id.* at ¶ 78. On April 13, 2017, Plaintiff William Robinson voluntarily returned from medical leave and was immediately "held out of service," i.e., suspended with pay pending a disciplinary hearing on the NOI previously issued by Amtrak. *Id.* at ¶ 79. Amtrak scheduled William Robinson's disciplinary hearing for April 26, 2017. *Id.* at ¶ 80. Yager returned to work from medical leave in late August 2018 and was immediately held out of service pending a disciplinary hearing on the NOI previously issued by Amtrak. *Id.* at ¶ 134. Prior to his scheduled disciplinary hearing, Yager notified Amtrak he was retiring. *Id.* at ¶ 138. Amtrak could not prevent Yager from retiring. *Id.* at ¶ 139.

39

Even viewing the facts in a light most favorable to Plaintiff, the non-moving party, Plaintiff has provided no evidence that the legitimate, nondiscriminatory reason for terminating Plaintiff articulated by Defendant Amtrak was pretext for discrimination, nor that he was treated differently than other similarly situated employees. All four employees were charged with NOIs following the Train 89 Accident; all employees were placed on medical leave following the Train 89 Accident; Amtrak scheduled a disciplinary hearing for all employees who returned from medical leave. *See supra* at 37-38. Plaintiff claims that "Amtrak *permitted* Mr. Yager to remain on indefinite medical leave for two and a half years so that he could reach retirement age without being held accountable for his actions," but the SUMF show that Plaintiff was similarly permitted to remain on medical leave until he *voluntarily* returned. ECF No. 57 at 30; ECF No. 52-3 at ¶ 79. Plaintiff was the only employee to go through with the disciplinary hearing because Yager retired, which Plaintiff could not do because he did not have enough years of service, and Snyder and Brigandi separated from Amtrak without returning from medical leave, which Plaintiff could have but refused to do. *Id.* Plaintiff has not shown that the other three employees were treated more favorably than he was or that discrimination based on Plaintiff's race was a "motivating or determinative cause" of his termination. *See Fuentes*, 32 F.3d at 764.

*(iii)* <u>*Plaintiff's Allegation That Decision Makers Acted with A*</u>
<u>*Discriminatory Motive*</u>

Defendant next contends that Plaintiff has offered "no evidence to suggest any decision-maker would even be inclined" to treat Plaintiff differently than any other employee. ECF No. 52-1 at 36. Defendant states that Plaintiff's speculation that "any or all decision-makers acted with a discriminatory motive is insufficient to create a genuine issue of fact on the issue of pretext, particularly given that he cannot even personally articulate a basis for his speculation." *Id.*

Plaintiff responds that his argument that Defendant Amtrak had a discriminatory motive is based on "Kruse['s] orchestrated and successfully implemented [] plan to blame Plaintiff for the accident," including "manipulat[ing] what was to be a 'fair and impartial hearing' [and] going to the extreme lengths of witness tampering when it came to Maurice Robinson," as well as "Maurice Robinson's testimony as to Kruse's discriminatory animus and favoritism of his Caucasian friend, John Yager." ECF No. 57 at 28.

Plaintiff testified that he believed only Frank Kruse, Carmina Agrawal, the charging officer who signed Robinson's NOI, and Frances Krische, the hearing officer, discriminated against him based on his race. ECF No. 56-5 at 153:4-15 ("Q. Anybody else with regard to your hearing other than Frank Kruse, Carmina,

the hearing officer that you believe discriminated against you based on your race? THE WITNESS: No.")

The SUMF indicate that Frank Kruse was an Amtrak Assistant Division Engineer responsible for track maintenance and inspection of the tracks in the Philadelphia and Wilmington areas. ECF No. 57-3 at ¶ 111. Because the Train 89 Accident occurred in Kruse's territory, he was required to, and did, respond to the scene of accident immediately after it occurred. *Id.* at 112. Mr. Kruse stayed on scene for approximately twelve hours, speaking with multiple employees involved in the accident and other engineering managers and collecting documentation from the employees involved. *Id.* at ¶ 113. Kruse was the only witness presented against Robinson at the disciplinary hearing. *Id.* at 117. Plaintiff has never heard Kruse make any comments about blacks or African-Americans. *Id.* at ¶ 145.

In Plaintiff's Supplemental Statement of Material Facts ("Plaintiff's SSMF"), Plaintiff states that he believed Kruse favored Yager because Yager is white. ECF No. 57-4 at ¶¶ 40. Plaintiff's SSMF assert that Maurice Robinson, an Amtrak track supervisor working at Amtrak since 1999, stated at his deposition that Kruse, Yager and others referred to themselves as the "Irish Connection" and referred to African American employees as the "black gang." *Id.* at ¶¶ 45, 47. Maurice Robinson also stated that Kruse made racial comments about another African-American employee who was trying to become an assistant supervisor,

saying they didn't want a threatening black man like that as assistant supervisor. *Id.* at ¶ 49. Plaintiff's SSMF further state that Kruse "had discussions with each of the other three employees who were charged by Amtrak (all of whom are white, Caucasian men), [but] he never had any such discussion with William Robinson." *Id.* at ¶ 65. Lastly, Plaintiff's SSMF state that "Kruse first told Larry Smoot and Maurice Robinson that they would not be compensated for their time testifying at Will Robinson's hearing. Then, only 20 minutes before the hearing was to begin, he changed course and told Maurice Robinson that, in fact, he could go and would be compensated. By the time Kruse told him he could go, it was too late for him to get coverage for his work and he couldn't go." ECF No. 57-4 at ¶ 38.

Plaintiff has presented no supplemental facts indicating Carmina Agrawal nor Frances Krische acted with discriminatory intent during the disciplinary process nor in the past. The SUMF show that Krische did not allow Plaintiff's attorney to attend Plaintiff's disciplinary hearing, nor did he allow "all requested documents and witnesses" by Plaintiff at the hearing. ECF No. 52-3 at ¶¶ 96-97.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts," yet, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); Fed. R. Civ. P.

56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote omitted)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986)) (emphasis added).

Plaintiff's claims that Kruse manipulated the disciplinary hearing by effectively precluding Plaintiff's witnesses from testifying, made racial comments to and around Maurice Robinson, though Plaintiff could not testify to any discriminatory comments that Kruse made towards him, and showed favor to Yager because he was white are insufficient to create a genuine issue of material fact as to whether the legitimate, nondiscriminatory reason to terminate Plaintiff was pretext. The record taken as a whole does not show that any invidious discriminatory reason was more likely than not a motivating or determinative cause of Defendant Amtrak's decision to terminate Plaintiff, nor that Kruse, Krische, or Agrawal held any discriminatory animus toward Plaintiff.

### (iv)   *Plaintiff's Contention that His Disciplinary Hearing was Unfair*

Finally, Defendant argues that Plaintiff's allegations that his disciplinary hearing was unfair is preempted by the Railway Labor Act and does not otherwise demonstrate pretext. Defendant contends that "[i]ssues presented in the [National Railroad Adjustment Board ("NRAB")] arbitration include whether Mr. Robinson's hearing was conducted in accordance with the terms of the [Collective Bargaining Agreement ("CBA")] between Amtrak and the BMWE, including whether Amtrak's decisions regarding witnesses and evidence were proper." ECF No. 52-1. Defendant Amtrak states, "[t]o the extent that Mr. Robinson's discrimination claim is premised upon his allegations that he was the only employee involved in the Train 89 accident who had a disciplinary hearing and that he was not afforded a fair hearing by Amtrak, those claims require interpretation of the CBA, its side letters, and the appended Consent Decree entered into between Amtrak and the BMWE," and thus are "preempted by the RLA." ECF No. 52-1 at 40.[3]

---

[3] Defendant further argues that "Robinson's Due Process Claim Is Barred By The RLA," ECF No. 52-1 at 42, however the Complaint does not allege a claim for deprivation of due process, ECF No. 1, and Plaintiff admits "[c]ontrary to Defendant's assertion, Plaintiff does not assert a claim for deprivation of due process," ECF No. 57 at 30.

Plaintiff responds that his allegations regarding perceived unfairness at the disciplinary hearing were to substantiate his discrimination claims and do not require an interpretation of the CBA. ECF No. 57 at 29-30.

The Court has already determined that the record is insufficient to show that Defendant Amtrak's reason for termination was pretext, without requiring an interpretation of the CBA. Therefore, Defendant Amtrak is entitled to summary judgment on Plaintiff's claims of race discrimination in violation of Section 1981 (Count I), Title VII (Count II) and the PHRA (Count III).

ii. *Hostile Work Environment in violation of Title VII (Count II) and PHRA (Count III)*

"To prevail on a hostile work environment claim, a plaintiff must show '1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability.'" *In re Tribune Media Co.*, 902 F.3d 384, 399 (3d Cir. 2018) (quoting *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017)). Because the PHRA "language is 'substantially similar' to Title VII, [courts] interpret both statutes identically and do not undertake a separate analysis of [a] state-law claim." *Id.* at 399.

"In determining whether an actionable hostile work environment claim exists, we look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris*, 510 U.S., at 21). "In evaluating a hostile work environment claim under [] Title VII . . . 'offhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). "Rather, the 'conduct must be extreme to amount to a change in the terms and conditions of employment.'" *Id.*

Defendant argues that Plaintiff has failed to present evidence sufficient to show a "severe and pervasively hostile work environment" because, aside from the "noose incident,"[4] Plaintiff "has not identified a single incident during the course

---

[4] William Robinson testified that when he attended a welding class at Amtrak in 2014, someone in the class made a noose and hung it up in a tool shed. ECF No. 52-3 at ¶ 146. William Robinson reported the incident to a supervisor and Amtrak investigated. *Id.* Amtrak removed the employee who was responsible for hanging the noose from class and disciplined the employee for his behavior. *Id.* at ¶ 147. William Robinson filed a charge of discrimination with the Equal Employment Opportunity Commission as a result of the noose incident. *Id.* at ¶ 148. The EEOC issued a Right to Sue letter to Mr. Robinson. *Id.* at ¶ 149. At that time, William Robinson understood he could file a lawsuit relating to the noose incident but chose not to do so. *Id.*

of his employment at Amtrak that could be deemed racially harassing."[5] ECF No. 52-1 at 45. Plaintiff plainly states, "[a]s has been amply demonstrated in discovery, it is not about the noose incident alone, it's about the hostile work environment that Maurice Robinson so aptly and amply testified to in more than ample detail. Plaintiff has posed more than discrete acts, also describing an environment." ECF No. 57 at 33. Plaintiff then notes, "judicial notice can easily be taken of" two separate actions "which also allege the maintenance of a racially-hostile environment" at Amtrak. *Id.*

Although, "under the totality of the circumstances [a district court] 'may,' but is not required to consider evidence of discriminatory conduct directed at other individuals, 'especially where such evidence may assist the factfinder in determining whether facially neutral conduct was actually based on plaintiff's

---

[5] Defendant claims that Plaintiff's allegations of hostile work environment are time barred because "[t]he sole incident that Mr. Robinson has identified during the entire course of his employment at Amtrak that has any obvious connection to race occurred in 2014, when a classmate of his in a welding class hung a noose in a tool shed." ECF No. 52-1 at 45. Because Plaintiff received a right to sue notice from the EEOC on September 18, 2015, Defendant contends he was required to file a lawsuit on that incident within 90 days, but he did not file a lawsuit against Amtrak until January 29, 2018; therefore, Defendant claims, this claim is time-barred. *Id.*
Plaintiff responds that the noose incident is "not the subject of this lawsuit nor is Plaintiff litigating that claim." ECF No. 57 at 32. Plaintiff contends that he "has shown, through the voluminous record cited to [previously in his brief], that that illegal and discriminatory environment has continued through to this day with respect to discipline and other issues at Amtrak," and the noose incident is relevant to show "Amtrak's continuing behavior with respect to perpetuating racial discrimination." *Id.*
In either case, as Plaintiff does not support his claim of hostile work environment with allegations of the noose incident, Defendant's statute of limitations argument is irrelevant.

protected class,'" this "does not allow [plaintiff] to rely on the evidence without demonstrating how conduct directed towards others impacted them in satisfaction of their own prima facie case." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 847 (3d Cir. 2016).

A plaintiff "cannot meet the first element of the hostile work environment claim under Title VII []—causation—solely by pointing to comments that were directed at other individuals." *Caver v. City of Trenton*, 420 F.3d 243, 263–64 (3d Cir. 2005). A plaintiff "cannot show that the comments would not have been uttered or written but for his race if [the plaintiff] was neither on the receiving end nor the subject of any comments." *Id.* at 263. However, "[a]lthough [] racist comments . . . [directed solely at others] cannot alone be the basis of a hostile work environment claim, evidence of those comments may be considered in determining whether facially neutral conduct on the part of [plaintiff's superiors] was actually based on [plaintiff's] race." *Id.* at 264.

Aside from the "noose incident" in 2014, on which Plaintiff claims he does not rely, ECF No. 57 at 32, all the racist comments identified by Plaintiff in his brief, the SUMF and Plaintiff's SSMF were directed at Maurice Robinson or Maurice Robinson's father. Plaintiff admitted during his deposition that Kruse, his supervisor, had "[n]ever ma[d]e any discriminatory comments toward" Plaintiff and that Plaintiff "[n]ever hear[d] him make any comments about blacks or African

49

Americans." ECF No. 52-4 at ¶ 31. Therefore, as an initial matter, Plaintiff has failed to meet the first element of the hostile work environment claim, causation, because he only points to comments that were directed to other people and none that were directed to Plaintiff.

Furthermore, even if the Court were to consider the comments Maurice Robinson testified to "in determining whether facially neutral conduct on the part of [plaintiff's superiors] was actually based on [plaintiff's] race," Plaintiff has still not shown, as discussed in detail above, any evidence that Amtrak's treatment of him following the Train 89 Accident differed from any other employee at Amtrak in a similar scenario, nor how any facially neutral conduct in the disciplinary process could be considered "aimed at harassing [Plaintiff] because of his race." *See Caver*, 420 F.3d at 263–64 (discussing whether facially neutral conduct, e.g. plaintiff's supervisors intentionally writing false memos and recommending plaintiff for psychiatric treatment, could be intended to harass Plaintiff based on his race, in the context of racist comments the supervisors made to employees other than plaintiff). Even recognizing the racist comments made towards Maurice Robinson and Maurice Robinson's father, Plaintiff has not shown that any conduct, either race-based comments directed to others or facially neutral conduct directed to him, was severe or pervasive, detrimentally affected him, or would detrimentally affect a reasonable person in like circumstances. *See In re Tribune Media Co.*, 902

F.3d 384, 399 (3d Cir. 2018). Plaintiff has not shown that any conduct that is part of the disciplinary process was intended to harass him based on his race. Therefore, Defendant Amtrak is entitled to summary judgment on Plaintiff's claims of hostile work environment in violation of Title VII (Count II) and the PHRA (Count III).

### iii.  *Intentional Infliction of Emotional Distress (Count V)*

Plaintiff alleges a claim against Defendant Amtrak for intentional infliction of emotional distress based "particularly through the actions of Frank Kruse" during the disciplinary process. ECF No. 57 at 35. Plaintiff's intentional infliction of emotional distress claim is not based on the Train 89 Accident, but "[i]t is from what transpired after the collision; namely the deliberate scapegoating of Plaintiff by Amtrak management." *Id.*

Defendant argues that the Federal Employers' Liability Act ("FELA") provides Plaintiff with the sole basis of redress for his allegations of emotional distress, and Plaintiff failed to state a claim under FELA. ECF No. 52-1 at 48. In the alternative, Defendant argues that Plaintiff failed to identify conduct sufficiently outrageous to support a tort claim for intentional infliction of emotional distress under Pennsylvania law. *Id.* at 49.

The Court need not decide whether FELA applies exclusively to Plaintiff's intentional infliction of emotional distress claim because Plaintiff has not made out a claim for intentional infliction of emotional distress under state law.[6] To prove a claim of intentional infliction of emotional distress under Pennsylvania law, a plaintiff must establish that (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused emotional distress; and (4) the resultant emotional distress was severe. *See Bruffett v. Warner Commc'ns, Inc.*, 692 F.2d 910, 914 (3d Cir.1982); *see also Taylor v. Albert Einstein Med. Ctr.*, 562 Pa. 176, 181 (2000). "[U]nder Pennsylvania law, 'recovery for the tort of intentional infliction of emotional distress [has been] reserved by the courts for only the most clearly desperate and ultra extreme conduct.'" *Pellegrino v. United States Transportation Sec. Admin. , Div. of Dep't of Homeland Sec.*, 896 F.3d 207, 230–31 (3d Cir.), *reh'g en banc granted sub nom. Pellegrino v. United States of Am. Transportation Sec. Admin.*, 904 F.3d 329 (3d Cir. 2018) (quoting *Hoy v. Angelone*, 720 A.2d 745, 754 (1998)).

Plaintiff contends that Kruse's conduct in participating in Plaintiff's disciplinary hearing was "intentional and reckless when it came to setting up Plaintiff for blame with respect to the" Train 89 Accident, that Kruse prevented

---

[6] In addition, Plaintiff has not brought a claim for intentional infliction of emotional distress under FELA and therefore any analysis as to whether Plaintiff has met the FELA burden is irrelevant.

certain witnesses from testifying at the disciplinary hearing, which "can only be characterized as being extreme and outrageous," Plaintiff suffered emotional distress caused by Kruse, and this emotional distress was severe because he was targeted by Amtrak and terminated even though he was only "a foreman who did not have control of the track and was not responsible for the collision." ECF No. 57 at 36.

Plaintiff's claim that he was targeted by Amtrak despite being entirely blameless is not supported by the record, which instead shows that he violated certain safety protocols which contributed to the Train 89 Accident. *See supra* at 35. Regardless of blame, the record does not reflect that Defendant Amtrak, through Kruse, subjected Plaintiff to "clearly desperate and ultra extreme conduct" during the disciplinary process. *Pellegrino*, 896 F.3d at 230–31. Nor has Plaintiff shown that Defendant Amtrak's conduct rose to the level of "extreme and outrageous," because this requires a showing that the conduct be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Miller v. Comcast*, 724 F. App'x 181, 182 (3d Cir. 2018) (quoting *Hoy v. Angelone*, 720 A.2d 745, 754 (1998)). Nothing in the record reflects behavior by Defendant Amtrak "beyond all possible bounds of decency," or "utterly intolerable in a civilized society." *Id.* Therefore, Defendant is entitled to summary judgment

on Plaintiff's claim for intentional infliction of emotional distress (Count V). As the Court has granted summary judgment on all claims against Defendant Amtrak, Defendant Amtrak's Motion for Summary Judgment is granted.

## 2. BMWE's Motion for Summary Judgment

Defendant BMWE moves for summary judgment on all of Plaintiff's claims against it.

### i. *Failure to Observe Duty of Fair Representation (Count IV)*

Plaintiff contends that BMWE breached its duty of fair representation during the Amtrak disciplinary hearing. "It has now been well established that a union certified as an exclusive bargaining representative has a correlative duty of fair representation." *Felice v. Sever*, 985 F.2d 1221, 1226 (3d Cir. 1993). The Supreme Court in *Vaca v. Sipes*, the seminal case on the statutory duty of fair representation, held that "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S. Ct. 903, 916, 17 L. Ed. 2d 842 (1967).[7]

---

[7] There is significant case law on hybrid cases in which a Plaintiff brings a § 301 claim against the employer and a simultaneous breach of duty of fair representation claim against the union. *See Felice v. Sever*, 985 F.2d 1221, 1226 (3d Cir. 1993) ("Ordinarily, an employee files a claim against the union alleging breach of the duty of fair representation together with a claim against the employer alleging breach of the collective bargaining agreement in a 'hybrid' section 301/duty of fair representation suit.") In these cases, Plaintiff is required to show both that the

"A union's conduct is arbitrary 'only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational.'" *Bakos v. Am. Airlines, Inc.*, 748 F. App'x 468, 471–72 (3d Cir. 2018) (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45-46, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998) (*quoting O'Neill*, 499 U.S. at 78, 111 S.Ct. 1127). "To show that union conduct was discriminatory, 'a plaintiff must adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives.'" *Bakos*, 748 F.App'x at 472 (quoting *Addington v.*

---

employer violated the collective bargaining agreement and that the union violated its duty of fair representation. *Id.* In *Hendricks v Edgewater Streel Co.*, although the Plaintiff had not explicitly stated a § 301 claim against his employer, the Third Circuit implied the employer's breach of the collective bargaining agreement claim where Plaintiff alleged he was improperly terminated in violation of ERISA and brought a § 301 claim against the union. 898 F.2d 385, 388 (3d Cir. 1990) ("Thus, [plaintiff's] claim that he was improperly terminated alleges a breach of the labor contract, while his claim that the Union failed to fully investigate or forward his grievance alleges a breach of fair representation.")

Here, Plaintiff has not brought a § 301 claim against either party and instead has argued that Amtrak breached Title VII, § 1981, the PHRA, and state law in terminating him and that BMWE breached Title VII, the PHRA, its duty of fair representation under 29 U.S.C. § 151 et seq., and state law during its representation of Plaintiff in the disciplinary process. ECF No. 1. To the extent Plaintiff's claim could be interpreted as a hybrid claim against the employer and the union, because the Court has determined that Amtrak is entitled to summary judgment on all claims against it, and because Amtrak has proffered a legitimate, nondiscriminatory reason for Plaintiff's termination, which was not undermined by a showing of pretext, Plaintiff has failed to show any breach of the collective bargaining agreement. However, because Plaintiff has not technically pled a hybrid claim, the Court analyzes the duty of fair representation claim separately.

*U.S. Airline Pilots Ass'n*, 791 F.3d 967, 984 (9th Cir. 2015). "A bad-faith claim 'requires a showing of fraudulent, deceitful, or dishonest action.'" *Id.* (quoting *White v. White Rose Food*, 237 F.3d 174, 179 (2d Cir. 2001)). "Plaintiffs also must show that 'the breach directly cause[d] damage to an individual or group to whom the duty is owed.'" *Id.* (quoting *Deboles v. Trans World Airlines, Inc.*, 552 F.2d 1005, 1019 (3d Cir. 1977)).

First, Plaintiff has failed to show that Defendant BMWE's breach of its duty of fair representation caused damage to Plaintiff because the Court has determined that Defendant Amtrak terminated Plaintiff for a legitimate, nondiscriminatory reason and therefore Plaintiff would have been terminated regardless of BMWE's representation.

Second, Plaintiff has failed to show that BMWE's representation of Plaintiff was arbitrary, discriminatory or in bad faith. Plaintiff argues that his union representative, Anirina, did not present all evidence requested by Plaintiff at the disciplinary hearing, did not argue that Yager was at fault and should have been disciplined instead of Robinson, focused on Robinson's charges instead of Yager's actions during the disciplinary hearing, met with Plaintiff for only 20 minutes prior to the disciplinary hearing, and told Plaintiff that he should have resigned instead of going through the disciplinary process. ECF No. 56 at 19-25. None of these claims supports a finding that BMWE breached its duty of fair representation in

representing Plaintiff at the disciplinary hearing. None of these actions are "so far outside a wide range of reasonableness as to be irrational," nor do they indicate "evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives," or "fraudulent, deceitful, or dishonest action." *See Bakos*, 748 F.App'x at 471-2.

Plaintiff's claim that Anirina should have focused his defense of Plaintiff on the claims against Yager is meritless because it relies on the assumption that if Yager were found in violation of Amtrak's procedures, Plaintiff would not also have been found in violation of Amtrak's procedures. Furthermore, all of Plaintiff's arguments related to Anirina failing to present certain evidence, failing to make particular arguments, or advising Plaintiff that he should resign are irrelevant upon consideration of this Court's finding that Amtrak had a legitimate, nondiscriminatory reason for Plaintiff's termination. Lastly, Plaintiff's argument that BMWE treated Yager more favorably than Plaintiff, and therefore acted with discrimination in violation of its duty of fair representation, is unsupported because BMWE never represented Yager in a disciplinary hearing as Yager retired prior to his disciplinary hearing, Amtrak could not prevent Yager from retiring and Plaintiff never held an officer position within the Union and therefore allowing Yager to remain in office did not afford him favorable treatment. ECF No. 52-3 at

¶¶ 9, 139, 141. Therefore, Defendant BMWE is entitled to summary judgment on Plaintiff's claim for violation of the duty of fair representation (Count IV).

      ii.   *Racial Discrimination in Violation of Title VII (Count II) and the PHRA (Count III)*

"[A] union may be held liable under Title VII . . . [where] the Union *itself* instigated or actively support the discriminatory acts allegedly experienced by the appellants." *Anjelino v. New York Times Co.*, 200 F.3d 73, 95 (3d Cir. 1999) (emphasis in original).[8] To establish a prima facie case in the context of a union violating Title VII, "a plaintiff must show (1) a violation of the collective bargaining agreement with respect to the plaintiff; (2) the union permitted the violation to go unaddressed, thereby breaching its duty of fair representation; and (3) some indication that the union's actions were motivated by some discriminatory animus." *Danao v. ABM Janitorial Servs.*, 142 F. Supp. 3d 363, 371 (E.D. Pa. 2015) (citing *Lopresti v. Cnty. of Lehigh*, 2014 WL 1885278, at *6 (E.D.Pa. May 12, 2014)); *see also Young v. Local 1201, Firemen & Oilers Union*, 2009 WL 3152119, at *4 (E.D.Pa. Sept. 25, 2009), aff'd, 419 Fed.Appx. 235 (3d Cir.2011)).

---

[8]"[T]he PHRA, 43 Pa. Const. Stat. § 955(c), mirror[s] Title VII's language and appl[ies] to Unions." *Martinez v. Int'l Bhd. of Elec. Workers-IBEW Local Union No. 98*, 352 F. App'x 737, 740 (3d Cir. 2009).

As previously discussed, the Court has determined that Defendant Amtrak provided a legitimate, nondiscriminatory reason for terminating Plaintiff, which Plaintiff failed to show was pretext for discrimination. Therefore, the Court cannot conclude that Plaintiff has shown a violation of the collective bargaining agreement by Defendant Amtrak with respect to Plaintiff. However, even if Plaintiff had shown such a violation, the Court has also determined that BMWE did not violate its duty of fair representation, as required by the second prong in the Title VII analysis for unions. Therefore, Defendant BMWE is entitled to summary judgment on Plaintiff's Title VII (Count II) and PHRA (Count III) claims of discrimination against BMWE.

iii. *Hostile Work Environment in Violation of Title VII (Count II) and the PHRA (Count III)*

"A labor organization, such as a union, may be liable under Title VII, the PHRA, and § 1981 for creating a hostile work environment." Boyer *v. Johnson Matthey, Inc.*, No. CIV.A. 02-CV-8382, 2005 WL 35893, at *21 (E.D. Pa. Jan. 6, 2005) (*citing Durko v. OI–NEG TV Prods., Inc.,* 870 F.Supp. 1268, 1277 (M.D.Pa.1994), *aff'd,* 103 F.3d 112 (3d Cir.1996)). "To determine whether a plaintiff may recover against a union under a hostile work environment theory, he must show that: (1) he was subjected to a hostile work environment; (2) he requested action on the part of the union; and (3) the union ignored his request for

59

action." *Id.* Where a court concludes that plaintiff was "not subjected to a hostile work environment, the plaintiff] may not prevail on [his or her] hostile work environment claims against the Union." *Id.*

As the Court has previously determined that Plaintiff was not subjected to a hostile work environment, *see supra* at 46, Defendant BMWE is entitled to summary judgment on Plaintiff's claim for hostile work environment in violation of Title VII (Count II) and the PHRA (Count III).[9]

   iv. *Intentional Infliction of Emotional Distress (Count V)*

Defendant BMWE argues that Plaintiff's claim for intentional infliction of emotional distress is preempted by the National Labor Relations Act ("NLRA") because "state-law claims are presumptively preempted by the NLRA when they concern conduct that is actually or arguably either protected or prohibited by the

---

[9] Even if the Court had to separately determine whether the Union created a hostile work environment, Plaintiff has failed to show there existed any discrimination on behalf of the Union that was "severe or pervasive," or "detrimentally affected the plaintiff." *In re Tribune Media Co.*, 902 F.3d at 399 (quoting *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017)). Plaintiff has stated that his hostile work environment claim is supported by evidence including "Maurice Robinson's testimony that Mr. Anirina 'takes care' of white employees as well as repeatedly addressing African Americans as 'you people.'" ECF No. 56 at 28. As stated previously, a plaintiff "cannot meet the first element of the hostile work environment claim under Title VII []—causation—solely by pointing to comments that were directed at other individuals," unless the comments help to determine "whether facially neutral conduct on the part of [plaintiff's superiors] was actually based on [plaintiff's] race *Caver v. City of Trenton*, 420 F.3d 243, 263–64 (3d Cir. 2005). There is simply no evidence of any severe or pervasive race-based discrimination on the part of the Union, nor any evidence of facially neutral conduct that was actually based on Plaintiff's race.

NLRA." ECF No. 51-1 at 31 (quoting *Pa. Nurses Ass'n v. Pa. State Educ. Ass'n*, 90 F.3d 797, 801 (3d Cir. 1996)). The Supreme Court has held, however, in *Farmer v. United Broth. Of Carpenters and Joiners of America, Local 25*, that a state tort is not preempted by the NLRA where the state tort claim is "either unrelated to employment discrimination or a function of the particularly abusive manner in which the discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself." *Farmer v. United Bhd. of Carpenters & Joiners of Am., Local 25*, 430 U.S. 290, 305 (1977) (finding the NLRA did not preempt Plaintiff's state court action to recover damages for intentional infliction of emotional distress). However, Plaintiff has failed to prove a claim for the tort of intentional infliction of emotional distress against BMWE.

As stated previously, to prove a claim of intentional infliction of emotional distress under Pennsylvania law, a plaintiff must establish that (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused emotional distress; and (4) the resultant emotional distress was severe. *See Bruffett v. Warner Commc'ns, Inc.*, 692 F.2d 910, 914 (3d Cir.1982); *see also Taylor v. Albert Einstein Med. Ctr.*, 562 Pa. 176, 181 (2000). "[U]nder Pennsylvania law, 'recovery for the tort of intentional infliction of emotional distress [has been] reserved by the courts for only the most clearly desperate and ultra extreme conduct.'" *Pellegrino v. United*

*States Transportation Sec. Admin. , Div. of Dep't of Homeland Sec.*, 896 F.3d 207,
230–31 (3d Cir.).

The record does not show any evidence to support Plaintiff's claim that
Anirina's conduct, or any Union member's conduct, was extreme or outrageous
and caused Plaintiff severe emotional distress. Even considering that the Union
did not remove Yager from his position with the Union after the Train 89 Accident,
that Anirina decided not to focus on Yager's actions in his defense of Plaintiff, that
Anirina questioned why Plaintiff returned from medical leave without resigning,
and even that Anirina testified that he believed Plaintiff was at fault for the Train
89 Accident,[10] Plaintiff has not shown that the Union committed the required
"desperate and ultra extreme conduct" for Plaintiff to recover for the tort of
intentional infliction of emotional distress. Defendant BMWE is therefore entitled
to summary judgment on Plaintiff's claim for intentional infliction of emotional
distress (Count V). As the Court has granted summary judgment on all claims
against Defendant BMWE, Defendant BMWE's Motion for Summary Judgment is
granted.

---

[10] ECF No. 56-6 at 139:2-140:17.

## IV. CONCLUSION

For the foregoing reasons, Defendant Amtrak's Motion for Summary Judgment (ECF No. 52) and Defendant BMWE's Motion for Summary Judgment (ECF No. 51) will be granted. An appropriate order will follow.

**BY THE COURT:**

DATE: _1 - 22 - 2019_

**CHAD F. KENNEY, JUDGE**